Okay, the next case is number 13, 1511, MassDOT Engineering, Incorporated, against the Patent and Trademark Office. Mr. Massey. Thank you, Your Honor. Good morning, and may it please the Court. This case presents a constitutional challenge to the first-to-file provisions of the America Invents Act, and there are two issues, standing and the merits. I'll begin with standing. We believe the evidence, the undisputed evidence, establishes that plaintiffs are suffering concrete injury here and now in the form of thousands of additional dollars in security-related costs, the burdens of additional patent applications, and the management time that goes into that. Mr. Massey. Yes. On page 31 of the opening brief. Yes. It says, plaintiffs detect intrusions and malware attacks on their computer system every week, and that a Florida company not far from MADSTAT confirmed an intrusion and theft of a private computer file containing millions, et cetera, citing the declaration of Mr. Statnick at JA 6364. What foundation do you have for that? How is that not hearsay? Well, it was not objected to below, Your Honor. We submitted this case on affidavits, and the judge asked each party whether they would like to have depositions or live testimony, and the parties agreed, the government agreed, that it would submit the case on the basis of declarations. Your answer is, there's no objection. There's no objection. That's it. That's the sole basis for somebody saying, hey, this thing happened down the road. Well, it happens to his facility. He gets malware. And then the Apple ID theft occurred, yes, at a nearby facility. Exactly. But that's an issue of proof at the district court. There was no objection on the basis of hearsay below, and as the record comes to this court, we take it as undisputed that these are the facts in the record regarding standing. And the district court did not find any of this evidence objectionable. The district judge said this was an exotic and speculative scenario. That's a matter of law. And that, we believe, is foreclosed by footnote five of Clapper, which says that if there's a reasonable risk of the reasonable need to take preventive measures as a result of government action, then the cost in taking those measures can establish standing, just as buying a burglar alarm is a reasonable precaution if you don't have to wait until the theft occurs and buy it after the fact. And if the government had wanted more evidence below, we stood prepared. Frankly, the reason for it all was that the case was filed in July of 2012 before the effective date of the act. And we were trying to move quickly. We moved for preliminary injunction within a month because we knew that the effective date was March 2013. We wanted to give the PTO and the government the opportunity to move if the district court had issued an injunction. We didn't want the government to say there's not enough time. And so that's why we were moving. We didn't think there were any serious disputes. Did you already have a burglar alarm in place? Did he, did Mr. Stadnik? He does have some security, but his affidavit, which again is unchallenged, he was never deposed, said he had to buy additional. He had to buy $3,500 in additional security equipment plus $100,000 in prototype testing equipment. All of this is in the record at A23-26 and A62-65. And the time, frankly, the time for challenging all of the standing allegations would have been below. And there's been no objection. And we take those as, we take the record as it is. And so I think under the Monsanto case from 2010, under footnote 5 of Clapper, under decisions of this court, like the Canadian Lumber case, these allegations are sufficient to establish standing. The harms are not exotic. They're not speculative. The Supreme Court walked through all of the case law that you rely upon in Clapper and distinguished all of it. And the grounds upon which they distinguish all of those cases seem to be awfully close to the precise grounds that would apply to your circumstances. So, I mean, I understand that the problem with Clapper is that sometimes bad facts make bad law. And the Supreme Court was clearly unhappy with the particular factual circumstances. But they said what they said. They did, Your Honor. But the government doesn't adopt, well, regardless of what the government says. The Clapper was a case where discretionary judgments of officials within DOJ determined whether someone was going to be placed under surveillance, was going to be subject to surveillance. And we take Clapper as saying you can't even prove that this law will apply to you because you can't know that these officials are going to give the clearance for you to be placed under surveillance. But they also talked about the extent to which the allegations depended upon illegal improper acts even of third parties. And that's the exact same thing that you have here. You're saying that we think someone's going to engage in an illegal act, that somebody from wherever is going to try to steal inventions so that they can become the first to file. And, you know, that's a lot to assume. Well, that was a lot to assume in Clapper because it was speculative that the third parties were going to be putting you under surveillance. But I think footnote five of Clapper is fairly clear that it's not saying there's no per se bar against having third parties as part of the causal chain. If that were true, then it would be overturning Monsanto, which had been decided only three years before. It would be overturning the Friends of the Earth case where people voluntarily made the decision not to swim in mercury, water that they thought was contaminated by mercury, as a result of government action. And so those cases, if there really is a rule that says any time a third party is in the causal chain, that causal chain cannot establish standing, then Clapper would have overruled numerous cases. Other cases cited in the briefs where the government starts a causal chain, a third party is in the causal chain, that reading of Clapper is extravagant. It can't be what Clapper meant. And footnote five of Clapper makes clear that it wasn't meaning that. The test is whether the plaintiff's fear is wholly speculative and hypothetical. If you imagine that you might be placed under surveillance with no proof. If the plaintiff's claim is based on a realistic possibility of harm, that's the language that Monsanto uses and that Clapper repeats, then there can be standing. And we think that since the evidence is undisputed, and frankly, none of these harms is speculative. Members of Congress, when the first to file provisions were being debated, and Congress set aside a special constitutional debate for the first time on this legislation, people warned, members of Congress warned, citing the former chief judge of this court, citing the experience in Canada when it switched first to file, they warned that these harms would occur. And they have come to pass. Let me interrupt you. Is it accurate, then, that the argument that you're presenting is that the standing, the harm is the possibility of some sort of theft, rather than, as I thought you were going to tell us, the need to enter into the system early or prematurely, not because of the possibility of theft, but because of some independent inventor elsewhere who might be doing the same thing? Exactly, Your Honor. That's exactly. We have made both of those arguments, and thank you. Is it one or the other, or both? It's both. It's both. Both of those harms. But, Your Honor, I appreciate your pointing out that, exactly, the burden to file early and often in the first to file system, which, as the government says at pages 40 and 41 of its brief, is the point of the system, that is a burden to us, to the plaintiff. And that, he has said, costs $10,000 to do a patent application. He has to spend his time and his company's time on this. So, that should have been the leading argument. I apologize, Your Honor. Thank you for pointing that out. We led you in that direction. All right. You have a little time. I would just like to say to the merits, before I reserve. Look, in many cases, suing to invalidate an act of Congress is a huge step. This case, though, we are asking you to adhere to a system that existed for over two centuries. We're asking you to adopt the views of Chief Justice Marshall, Joseph Story, Thomas Jefferson. The argument that we are making is… I don't know, Your Honor. But, the argument the government is making, on the other hand, is unlimited. They would have you apply the rational basis test to congressional legislation of adopting first to file. Rational basis is the test. And it wasn't in cases like Lopez, which in the Commerce Clause area said Congress couldn't make a law prohibiting guns within schools. Lopez said there's a structural, had a structural ground for decision. In other words, it wasn't Commerce. We're saying it's not an inventor. And that argument can't be subject to rational basis. If it were, the government could vest the patent in whoever it thought would be best suited to commercialize it. You agree, though, that rational basis test would apply if the argument had to do with whether or not this actually furthers the useful, progress of the useful art. Yes. That's Figaro and Eldred. But we are a different kind of case. And we rest on the first Congress, the meaning of the word inventor, and the fact that early decisions made clear that in cases of interference, the first inventor got the patent. And that was, after all, the purpose. Which doesn't actually say in the Constitution, first inventor. I mean, the government does hang its hat a lot on the fact that it just says inventor. And why couldn't you have more than one inventor? I mean, two different people could independently come up with the same great idea, right? Well, that is why we look at history. And that is why we look at the dictionary definitions at the time, the judicial decisions, which are very clear, very clear, saying it's the first and true inventor. That's why the 1790 Patent Act said, if it provided for repeal of a patent, if it hadn't been vested in the first and true inventor. So, clearly, the word inventor meant that. You want us to channel Justice Scalia? Is that what you're saying? We think that this is a, whatever methodology of interpretation you take, you come to the same conclusion in this case. Thank you. If I could reserve the balance. Let's hear from the other side, and you have some rebuttal time. Mr. Freeman. Thank you, Your Honor. May it please the Court, Mark Freeman for the government. I'm happy to begin with whatever interests the Court, but I'll start with standing. Why don't we flip that first? Why don't you just address what he was talking about at the very end? Because, I mean, you do have sort of a good logical argument that the word inventor could have a broader meaning, but there's an awful lot of historical support for the position that they take that, at the time, it was understood that inventor meant first. So, I disagree with that, and let me explain why. Let's start with Gaylor v. Wilder in the 1850 Supreme Court decision, in which this is one of those old Supreme Court decisions where, if you look in the U.S. reports, you can see the arguments of counsel before you get to the case. If you look at the arguments of counsel, it's exactly the argument that my opponent presents today. That was a case in which someone had previously invented a safe that was fireproof using plaster of Paris, but they had not disclosed it to the public. They had kept it and used it in their own shop, and then someone later came along and invented what everyone in the Court conceded, and the case conceded was the exact same thing, and filed for a patent, and they got the patent. And in the challenge in the Court, the party said, wait, wait, hold on. We have a first-invent system. He can't get a patent because it was previously invented by someone else. It was known in the world this person was not the discoverer or the inventor. But your friend on the other side says that that case really turned on concepts of concealment. But your honor, this is just the point. If Congress can enact a statute that says, as it did, and it's undisputed that it did, that the person who is first to actually discover and invent something does not get the patent, and we give the patent to a later-in-time person because that first person didn't act quickly enough in disclosing the invention to the world, that is a statement that Congress has the constitutional authority to determine, on a rational basis incidentally, who is an inventor. And if that statute is constitutional, then this one is. And there is no daylight between the two. In fact, the dissent in Gaylor v. Wilder said, this decision is wrong because you're not giving the patent to the actual first to invent. But this is not – my opponent likes to talk about – take stray language from Supreme Court decisions talking about applying a first-to-invent principle of priority, and of course in those cases they talk about a first-to-invent principle of priority. But when the Supreme Court was presented with the question, can we give a patent to a person who was, as it was undisputed, was not in fact the first to invent, the answer was yes. And they said in the case, although he was not in fact the first to invent, he is the first to invent in the eyes of the law because he was the first to give it to the public, which is of course exactly what the first-inventor-to-file system does. And my opponent also has no answer for what is the firmly settled principle through all of American patent law that, for example, a foreign use, an unpublished foreign use of an invention did not prevent the issuance of a patent in the United States. If my colleague was correct, if we look just to the dictionary definitions in the Samuel Johnson Dictionary of the period, then under his interpretation of that dictionary – and I'm happy to address that incidentally – but under his interpretation of that dictionary, then it would have been unconstitutional. Congress was constitutionally disabled from allowing patents in those circumstances because someone else in the world had previously invented it. And so as they say in their complaint at page 878 of the appendix, the later in time person was not the inventor, they were the rediscoverer. But that simply is not how patent law in the United States has ever operated. Now he wanted to talk about dictionary definitions. This is quoted in his – he reproduces in the joint appendix the Samuel Johnson Dictionary. And he points out, yeah, it says, an inventor is a person who brings forth something not previously known. But as the Supreme Court told us in Gaylor v. Wilder, what that means is known to the public. And it was certainly rational for Congress to decide that how we're going to determine if something is known to the public is the first person to file a patent application disclosing an enabled description of the invention. Now the other thing, incidentally, that that Samuel Johnson Dictionary says is it describes discovery as the revealing of a secret, revealing to the world something not previously known. Of course, that definition is entirely consistent with a first inventor to file system because that is the person who first discloses to the public in the manner contemplated by the law the revealed invention. It also says that oatmeal, which I had for breakfast this morning, is in Scotland a food for men and in England a food for horses. That's true. One has to be careful about these things, and that's why, Your Honor, if we're going to look back at history as my colleague, my opponent would like us to do, I think the right place to look is to the actual holdings of the Supreme Court of the United States where the argument was directed to them. They rejected that argument in emphatic terms, and the dissent would have adopted the view that my opponent advocates. That's pretty compelling. But let me back up, and if I may, because I'm here from the Department of Justice, we care about standing, and we care about it for good reason. When parties come into court and they say, I want this court to pass on the facial validity of an act of Congress, in any pre-enforcement challenge, we stop and ask first, are you actually injured due to a concrete injury? When you're asking a federal court to pass on the facial validity of a statute passed by Congress and signed by the president, we insist, because then you've got principles of constitutional avoidance on top of that. We insist on proof of personal, actual, imminent, or concrete injury. But you would agree that Clapper was an extreme set of circumstances. I would agree that Clapper was an unusual case, Your Honor, but I also agree with the point that you made earlier, which is that in discussing the cases on which my opponent relies, it pointed out things that were in those cases. Let me take the one on which my opponent relies most. That's the Monsanto case. The court will remember Monsanto involved an environmental law challenge, a NEPA challenge to the deregulation of genetically modified alfalfa. And the plaintiffs in that case established standing by showing that if the deregulation decision was not overturned, then they would have to take extreme and expensive precautions to protect their land. And the Supreme Court said, yeah, okay, they've shown through actual evidence that that's true. And they have a footnote in the case. It's footnote three of the Monsanto decision where they describe the evidence put on by the plaintiffs in that case. What they said was, I thought this was interesting, I learned about alfalfa. The farms are typically across the street from each other, very close. Alfalfa is fertilized by bees and bees… Or that the fact of, let's say that there's evidence to show that a fair number of patent applications were necessarily placed into the system sooner than they would have been otherwise had there been more time to develop the subject matter. And therefore, this amount of money was spent that might not have had to have been spent at all. Your Honor, I think… Why is that any different? So, first of all, that's not what the declarations say, so they haven't made that showing and the district court was correct on that ground. But let's suppose it is what they said. That would still be speculative because what they need to show is not an injury, not the claim that the AIA changes the incentives for people in the world. Would it be speculative even if it were shown or you're saying it's speculative that such a showing could be made? No, it is speculative even if it were shown because what that would not be is a showing that these plants were personally injured by the AIA. So, we have to… I mean, I'm guessing that if we did a sweep of every in-house patent counsel out there that they would tell us that they're petrified about these kinds of thefts and that anything that would increase the incentive for these kinds of thefts would be a problem. Now, are you telling me we have to wait until they're actually a victim of a theft of their IP before there could be standing? No, Your Honor. Someone who comes to this court or the district court and says I have standing to challenge the facial validity of an act of Congress because I'm worried about theft would have to have some reason that differentiates them from every other general counsel in the country. So, it is not a fear shared by all, but they are personally injured uniquely. And if they are personally injured uniquely because, for example, they've received a letter from someone saying I'm going to hack into your system and take your content and patent it, then they may well have standing. I presided over district court cases where there were criminal charges about thefts of IP. But even that plaintiff under your theory would still have a difficult time because who's to say it's going to happen again? Well, right. That's the Lyons case in the Supreme Court. And if the conclusion that we draw is that it's hard to show that you have standing to challenge an act of Congress on its face, I think that's consistent with what the Supreme Court says. Is it possible to? It is. Of course it is possible. Give me a scenario. If the plaintiffs in this case said we have a patentable – we were the first to invent a motorcycle shield. That's the patent that's been issued to Mr. Stetnik. But we were denied the patent for that because although we were the first to invent it, in fact, someone else filed a patent application for substantially the same invention and PTO denied our application. Under prior law, we would have prevailed. Under the AIA, we lose. We have standing to challenge the validity of the AIA. And, in fact, that, if I just may, underscores one of the basic reasons why this suit is premature in the extreme. In the district court, we challenged the plaintiffs to say, do you actually have any patentable intellectual – any patentable idea? Do you want to strike down the Patent Act? Does the Patent Act have any bearing on you? And what they say, and this is page A62 of the appendix, is the plaintiff says, I am proceeding on the assumption that many of my ideas that I have in development now will become patentable. He's proceeding on the assumption – it's a quote – that his inventions will become patentable. We do not strike down or adjudicate the validity of acts of Congress based on plaintiffs' assumptions about future activity. Your position is that there would have to actually be a derivation proceeding in which someone loses before there would be standing. No, there wouldn't have to be a derivation proceeding in which someone loses. I don't want to overstate this, Your Honor, but you would need to show that you, unlike your neighbor, unlike any other small business or large business in America, are personally affected by this statute because it injured your legal rights or is imminently going to injure your legal rights. Well, one presumes that that letter or email that says we're going to steal your patent is going to be of interest to the PTO when the person applies for it. And this is the reason why we point out the derivation proceedings, not because you have to win a derivation proceeding before you have standing or lose one, but because the fact that Congress provided this scheme to make it unlikely that even if you did steal a patent invention that then you still would not be able to keep the patent because you would lose is for the reason why it is pure speculation that anyone would attempt to steal the IP of any individual plaintiff. And let me also note… Let's put aside the theft aspect and turn our attention to the authentic independent invention and the need to foresee the possibility, as every inventor must, that someone else will have the same idea and therefore to enter into the system prematurely for their protection. Yes. On that point, Your Honor, two things. First, plaintiffs are no differently situated with respect to that incentive if there is one created by AIA than every other prospective inventor in the United States. Actually, all the more reason for the nation to be interested in whether in fact this statute conforms with our fundamental documents. Your Honor, if that were a reason to adjudicate the facial validity of an act of Congress, every act of Congress would be adjudicated on its face, its constitutionality, immediately. The Supreme Court in the… Not everyone on its face presents a question. Your Honor… Do you agree or do you think they all present questions? I disagree. Look, if it were a principle of standing law that because the American people want to know the answer to a question, we should answer it now, we would see a lot more of these challenges in the line-item veto cases in the Supreme Court. That first came to the Supreme Court in the Raines v. Byrd case, and the Supreme Court said in that case, these plaintiffs have no standing, and it doesn't change that conclusion that we think the line-item veto act presents a hard question of constitutionality. They waited years until they got Clinton v. New York when someone actually had been injured by a line-item veto. A line-item that would have benefited them was stricken, and on that basis, the court adjudicated the validity of the act of Congress. This is a very important principle because every act of Congress, every statute changes incentives somehow, and every person whose incentives are changed might say, you know, now I have an incentive to do something a little bit differently. But we insist on a greater showing of actual injury and personal injury, not just fear, but personal injury before we pass on the validity of an act of Congress. I would say that this applicant could show without any difficulty that he had to file 20 patent applications at a cost of tens of thousands of dollars, or maybe altogether hundreds of thousands of dollars, just to protect against the possibility that in a competitive environment in which these inventions exist, he had to protect against even the long-shot chance of not being the first. Your Honor, he would still lose, and the reason is, take this court's decision in Quigg. That was a case in which there was a challenge to the patent office's decision to begin allowing patents on genetically engineered animals. And one of the plaintiffs was a farmer who said, well, this is going to injure me competitively because I don't trade in genetically engineered animals, and now there's going to be more competition as a result of PTO's decision to allow these patents. And what this court said, a five-member court, was that decision, that if there is a competitive injury, that is not fairly traceable to the decision of the PTO to begin allowing these patents. That is an injury caused by a third party not in front of the court. And on the question that Your Honor asked me specifically about the likelihood of having to file more patent applications, I think it's common ground among the members of this panel that, of course, even before the AIA, the reason Congress enacted the provisional patent application system, which predates the AIA, was because there was intense pressure to get your disclosures on file, and a patent applicant would be a fool to wait and count on winning an interference proceeding. So there was already a very strong incentive. And whatever marginal incentive the AIA creates because of the particular field in which a particular plaintiff happens to be operating, any injury flowing from that is not, under this court's decision in Quigg, under the Supreme Court's decision in Simon, fairly traceable to the government action that they want to challenge. This is, as the district court said, a premature case brought by someone who does not have an actual injury. This court, I'm sure, will one day have the opportunity to pass on the validity of the first inventor to file systems, but that should wait for a plaintiff who is actually injured by that system. I just have one question before you sit down. Yes. Is it your view that every time there is a challenge, a facial challenge to a congressional provision, that the case arises under both the Constitution and the congressional provision at the same time? You're reverting to the statutory jurisdiction of this court. We think that we agree with the plaintiffs that in this case, not every time, but we agree with the plaintiffs that in this case under the sort of federal ingredient theory of arising under jurisdiction, the Supreme Court has construed the phrase arising under, to include the interpretation of, to include cases in which although the cause of action does not initially arise under the relevant sphere of law, the decision so much requires the interpretation or answering of a statutory question involving that field that it nonetheless arises under. So you can have a state law cause of action that arises under federal labor law, for example. So are we under the Grable analysis, Gunn v. Minton? The government is not here disputing that this court has statutory jurisdiction. But we have to consider that. I know you do. I'm a bit of a nerd when it comes to jurisdiction, so I'd like to know the answer. As a fellow nerd, I can tell you that we thought of this question as well. And evidently, so did the plaintiffs. They filed their protective notice in the 11th Circuit. And we've not challenged this court's jurisdiction because we think it's right. We think the court has jurisdiction here, and we considered it for that reason. Although I think their cause of action does arise under the Constitution rather than under an act of Congress, I think in the initial sense, I think the conclusion is this is nonetheless an action arising under an act of Congress related to patents because, as I think our discussion so far has made clear, the court cannot possibly resolve the question presented without interpreting acts of Congress related to patents. Okay. Thank you. Okay. Thank you, Mr. Freeman. Mr. Massey? Thank you, Your Honor. You would expect that the government might cite a broad array of cases creating a broad reservoir of a congressional authority, as it would if this were a Commerce Clause case or Taxing Clause case. In the patent area, there is none. There is no longstanding precedent allowing Congress to do the first to file or anything like that. The case the government relies on, the main case— Congress, luckily, until now, they haven't messed in the area too much. Unfortunately, that's changing. Well, that does count for something, doesn't it? I mean, the longstanding practice of first to invent means something. There's a lineage directly from Thomas Jefferson and John Marshall. And the 1850 Gaylor case, which is the government's primary authority, is, as Your Honor pointed out, essentially a concealment case. And it's a very strange case. It does not announce a broad congressional authority to determine priority or anything like that. But if they're allowed to say that concealment can take away the right, then why wouldn't they be allowed to say that later filing can take away the right? Because all rights are subject to regulation. But if they're regulated to that extent, they would be extinguished. That's sort of our voting rights example in the brief. I mean, the cases are very clear that losing the race to the PTO is not equivalent to suppressing or concealing. And the cases all say that the inventor has ample time to act in good faith to perfect the invention. And if the court were to say that to go as far as the government seeks, it would mean nothing at all. And in Gaylor in particular, at page 498, this is what the case turns on, this fact. The Connor safe had passed away from the memory of Connor himself and of those who had seen it. And the safe itself had disappeared. The knowledge of the improvement was so completely lost as if it had never been discovered. That is the context in which the subsequent inventor was allowed to claim. And that's completely different. That's like an atypical example. That is such a completely different context from the normal context of simply a subsequent inventor. That case turned on the very specific fact. And it doesn't establish broad congressional authority. And same with the foreign example that my opponent cites, that unpublished foreign uses are not prior art. Of course, foreign citizens would lack patent rights under our Constitution. And there are also problems of proof with unpublished foreign art. Published foreign art has always been treated as part of prior art. But if there has been an unpublished foreign use, as the briefs discussed, there were practical problems with, especially in the 18th and 19th centuries, with understanding what those foreign uses might be. So Congress, the fact that there was a separate, a special rule developed for unpublished foreign uses does not create, again, broad congressional authority to simply readjust or redefine who inventors are. And I would like to say, too, that we are not simply resting on sort of a Justice Scalia, originalist or textualist dictionary kind of argument. What we're really arguing is the purpose of the patent clause was always to escape the royal monopolies of England. It was a kind of labor Lockean theory of property that the founders adopted, that the right to a patent stemmed from ingenuity and hard work, not from a government-bestowed privilege. That was the whole English system from which they were departing. So in a very real sense, first to file reinstates the system of royal prerogative and the government licensing as the basis for the property rights. That was the very system that the framers were rejecting when they said, it's the sweat of the brow that creates the property right. And that's where first to invent came from. That is what Story and Marshall and their colleagues were discussing. And we think that that time test— I mean, I know what the government's response to that is, and that we're not saying that anyone that files can automatically get it. They have to have engaged in their own independent sweat of the brow in order to be a filer. So that you file, you're subject to the derivation proceeding. If you're not a true inventor, maybe not the first inventor, but if you're not an actual inventor, you can't get it. Well, of course, we debate in the briefs whether there is any more an actual inventor requirement after the deletion of 102F. But assuming that even there is, the point is that person prevails, though, over the actual first inventor under the first to file system. And that's the constitutional violation. Yes, they may have been engaged in some enterprise, but the point is they were not the first. And so if the under first to file, the tie goes to the person who wins the race to the PTO, to the person who got the king's prerogative. And that is the very system that the framers were objecting to. I think one question on—I know we're past our time, but just one question going back to the standing. Yes, Your Honor. Even if you could argue that the government goes too far to say that you have to actually have a patent rejected, isn't it fair to say that you at least have to establish that you've got an application that would be ready to go or close to ready to go and that you're somehow being forced to file too soon? You haven't even gone that far. Well, my client has said, right, he has three patents, and he's in the process of doing more. And, of course, the record is closed, so it is what it is. He's continued, obviously, to keep working. Whether he—you know, the timetable for submitting it, I think it's clear that he has said that, on the basis of the record evidence, that he's filing sooner and incurring more costs sooner than he would prefer, than he would otherwise have to do under first to invest. He said he feels like he's going to have to, but he didn't actually say that there was a particular application that he filed sooner than he would have preferred to. He has said he's incurring additional costs, and he hasn't given you—he hasn't given us a timetable for when he's filing. And, in fact, I don't know whether he might have filed since this appeal has been pending. But he has said that he's incurring the costs, as Judge Newman was pointing out, that the costs of incurring the additional applications have been—those are in the record. It is clear that he has incurred the costs. Whether he's actually filed the application yet is not clear from the record. But I don't think that is essential to the standing inquiry, that the burden is the injury, the burden of having to incur the attorney's fees and the management costs and the costs on his time. Okay. Any more questions? Okay. Thank you. Thank you, Your Honor. Thank you both, Mr. Massey and Mr. Frieden.